In the Matter of C. R. POPE & ASSOCIATES, INC., Bankrupt.

Don BAUCOM, Trustee in Bankruptcy,

v.

COMMUNICATIONS HAWAII, INC., dba Radio Station KGU, a Hawaii corporation.

No. 64–49.

United States District Court
D. Hawaii.

Oct. 27, 1965.

Hoddick, Rothwell & Chang, by Howard K. Hoddick, Honolulu, Hawaii, for trustee.

Pratt, Moore, Bortz & Vitousek, by Roy A. Vitousek, Jr., Honolulu, Hawaii, for KGU.

TAVARES, District Judge.

A voluntary petition in bankruptcy was filed by C. R. Pope & Associates, Inc., on March 18, 1964; on November 30, 1963, about three and one-half months prior to the filing, Pope paid more than $5,000.-00 to petitioner, radio station KGU; the Referee in Bankruptcy has found that the payment was preferential within the meaning of § 60, sub. b, of the Bankruptcy Act (11 U.S.C.A. § 96, sub. b), and has filed an order pursuant to § 39, sub. c, of the Act (11 U.S.C.A. § 67, sub. c) requiring station KGU to turn over that sum to the bankrupt's trustee; KGU petitions for review of that order.

This Court has before it the entire record in this case, including the Referee's Order and Decision, the briefs and memoranda of counsel filed before the Referee, and a verbatim transcript of the hearing (which had not been transcribed at the time of the Referee's decision).

In November, 1963, Pope was indebted to KGU in the amount of some $7,200.00, based upon three contracts for radio time (for Pflueger Lincoln-Mercury, Inc., Panasonic Radios, and for H.M.S.A.), and on an open account for some photographs.

Apparently at the time there were also some smaller amounts owing from Pope to KGU on account of other services performed under the same contracts, but these were not yet overdue and were not included in the assignment when the accounts were transferred to a collection agency.

The accounts totaling some $7,200.00 however, were past due on November 26, 1963, on which date they were assigned by KGU to the Reliable Collection Agency of which Joseph Leder was the Vice President.

The billings under such contracts were made as of the end of each month, for all such accounts, regardless of what day during the month the charge was incurred, and were payable under the custom of the trade on the 25th of the succeeding month. The billing as to the Panasonic account indicated that the debtor was billed $781.56 as of the end

of each of the months of April to September, inclusive. Under the customary trade procedure, inasmuch as the first payment made on this account was $1,-183.95 on July 17, the delinquency would be computed as follows (Exhibit 3–A):

The April 30th billing was due May 25; the May 31 billing was due June 25; the June 30 billing, not being due until July 25, was not delinquent at the time the July 17 payment was made. Thus, when the July 17 payment was made, it left a delinquency of $379.17 on the balance of the billing made on May 31st, which had become due on June 25, and this was carried over and remained delinquent as of June 25, being added to by the billings for June 30, July 31 and August 31 of $781.56 each, all of which were delinquent by the time the next payment, of $781.56, was made on October 14. Applying this last payment to the June balance first, it would mean that the delinquency of $2,741.85 really went back to July 25, the September 30 billing of $781.56 not being delinquent until October 25. Thus when the payment of November 30 on this account was made, the delinquency went back to July 25, a period of a little over four months.

Likewise, analyzing Exhibit 3–B, the H.M.S.A. account, the charge of $105.57 for July 31, 1963 became due August 25, 1963, and when paid on November 30, was just a little more than three months overdue.

Similarly, analyzing Exhibit 3–C, the Pflueger Lincoln-Mercury account (hereinafter called Pflueger), we find that when the delinquent balance of $2,893.37 was paid on November 30, the delinquency extended back to July 25, a little over four months.

A similar analysis of Exhibit 3–D apparently being an open account of KGU with the debtor, shows that the delinquency of $10.65 extended back to September 25, as to $1.44, and back to November 25, as to $9.25.

The evidence indicates that after making the assignment and even while the collection proceedings were pending against the delinquent debtor, KGU continued to extend credit to the debtor corporation which apparently continued in business until the time of its filing of the bankruptcy petition in March, 1964. It appears also that the debtor had customarily been slow in paying its accounts to KGU since the year 1962.

Among other things, petitioner KGU complains of the finding of the Referee that the accounts constituted "an accumulation of credits extended by KGU over a period of considerable time." The Court does not undertake to determine whether a delinquency of a little over four months as to certain portions of the total indebtedness justified the Referee's finding of a "considerable time," but in the light of the foregoing facts, the delinquency did not per se give KGU "reasonable cause to believe" that the debtor was insolvent.

The petitioner also complains of the Referee's holding that a certified public accounting firm made an "audit" of the books of the bankrupt, and complains of the Referee's conclusion drawn from this so-called "audit" that on November 30, 1963, the bankrupt's liabilities exceeded its assets by some $45,000.00, and was in fact insolvent.

Confining ourselves for the moment to the so-called "audit" alone (Exhibit 1), the Court agrees with the petitioner that the comparative balance sheet prepared and furnished by Alexander Grant and Company, a firm of CPA's, should not have been admitted in evidence on the showing made, but it must be noted that the admission in evidence was allowed without objection by counsel for KGU, who now acknowledges error in permitting this to happen. However, we need not decide whether we should strike this exhibit from the record evidence, for the certificate of the CPA firm which qualifies the entire report (Exhibit 1), nullifies its effect for all practical purposes. The certificate, after stating that the CPA firm has examined the accounting records of the bankrupt, and prepared the accompanying comparative balance

sheet as of December 31, and November 30, 1963, then states:

"The condition of the records during the periods under review was such that we were unable to verify the disposition of certain cash receipts as explained in Note A to the comparative balance sheet. In addition, we did not apply the generally accepted auditing procedures necessary for an expression of opinion on our part.

"Because of the condition of the records and the omission of generally accepted auditing procedures *we are unable to express an opinion on the fairness of presentation of the accompanying comparative balance sheet.*" (Emphasis added.)

It is to be noted that this comparative balance sheet is dated and was prepared about October 21, 1964, nearly a year after the payment in question, at a time when, with all the hindsight available, a much more reliable set of figures would normally be expected. It should also be noted that the last page of this comparative balance sheet discloses that during the months of November and December, 1963, a total of $10,682.00 of cash received was not deposited in the corporation's bank account, and that the disposition of these receipts could not be determined from the corporation's records. Without further explanation, the report would be open to serious question as to whether an even greater amount than this $10,682.00 might have been received and not disclosed by the corporation's records.

The testimony of the witness Frank W. Smith, a CPA and member of the firm which prepared the comparative balance sheet, further reveals the unreliable, if not worthless, nature of the comparative balance sheet. He testified that it was prepared under his supervision; that his firm had originally been asked by the trustee to prepare a balance sheet as of December 31, 1963, and then as of January 31, 1964, and that the records after December 31st were insufficient to permit the preparation of balance sheets, so

that the instructions were changed to call for balance sheets for the comparative dates of November 30 and December 31, 1963. He also stated that his firm had at first been retained by the debtor firm to reconstruct its records some time shortly prior to August 31, 1963, and that they reconstructed the accounts through September 30, 1963; but having reached this point, their services were terminated in December of 1963, and they did not do any further work on the matter until asked by the trustee in bankruptcy to prepare these balance sheets, whereupon they continued their reconstruction of the accounts.

He stated that in an *attempt* to determine whether reasonably accurate figures were being derived from what records were made available to the accountants, they had sent out, some time in September or October, 1963, confirmations to all customers as of August 31, 1963, relating to accounts receivable, and had done the same thing with respect to accounts payable. However, there is no testimony or evidence to the effect that these attempted confirmations to any extent proved the accounts to be accurate.

He then testified that *"based on the records we had available to us to work with * * * to bring these records forward,"* these balance sheets disclosed a deficit in retained earnings as of both the dates November 30 and December 31 (emphasis added). Again there is no testimony or evidence that the figures themselves were in fact accurate.

Asked leading questions by counsel for the trustee as to whether the liabilities exceeded the assets, this witness carefully again qualified his answer by saying "the liabilities *on this particular balance sheet* do exceed the assets *on this balance sheet.*" (Emphasis added.) He then proceeded to state what is indicated by the balance sheet, Exhibit 1, that the figures there disclose an apparent deficit of $45,766.00 as of November 30, and $45,477.00 as of December 31.

The foregoing demonstrates that this report (Exhibit 1) and the testimony of

the CPA Smith based thereon are totally insufficient to prove insolvency. There is no other evidence in the record to prove insolvency as of November 30, 1963, unless the testimony of Mr. Pope himself can be considered to supply this. Mr. Pope's testimony is as follows on the question of possible insolvency as of November 30, 1963 (Tr. P. 36):

"Q Was your agency—was it at that same time feeling the pinch pretty badly about meeting your obligations?

"A Yes, we were, and most of my creditors understood.

 * * * * * *

(Tr. 39–40):

"Q Now, at that time, again referring to 'that time,' [referring apparently to the date the complaint, Exhibit 2, was served on the debtor, which would be November 27, 1963] was your company insolvent *in your opinion?*

"A Yes.

"Q I am not talking about—

"A As far as liability.

"Q Not your looking back at it now. I am talking about *your state of mind at that time.*

"A Yes. It was, because that is the reason I was on the Mainland. I was trying to make an affiliation up there.

"Q *You recall assuring Mr. Jim Danford that everything was all right because you had this big Matson account?*

"A Well, do I recall saying that? Is that your question?

"Q Yes.

"A *Perhaps I did say it. I don't recall saying just that, but I was a born optimist, and I felt that I could hold this thing together. But we were definitely in trouble. No question about it.*

"Q *But you felt at that time you could hold it together?*

"A I felt that I could. * * *" (Emphasis added.)

Later the Referee asked him as follows (Tr. 42):

"THE REFEREE: *Did you at any time ever present or tell anybody that you were insolvent—that is, that your assets did not equal or exceed your liabilities?*

"THE WITNESS: *Yes.*

"THE REFEREE: *Who did you tell that to?*

"A *Well, a number of people. I mean a number of people in the business in town knew that I was having difficulty. I can't recall specifically.*

"THE REFEREE: *Was it anybody in connection with the KGU account?*

"THE WITNESS: *No, not that I can recall.*" (Emphasis added.)

If this is evidence of insolvency, it is ambiguous and vague and it actually tends to disprove that KGU had notice of possible insolvency. Moreover, it seems to equate insolvency with having "trouble" with paying ones bills, the two not necessarily being the same. The inference to be drawn from this testimony, seems more logically to be that Mr. Pope was so optimistic he thought he could "hold it together," meaning the business) which to this Court can only mean that he thought that he had enough goodwill and foreseeable accounts to keep the business going long enough and well enough to ultimately work out of the situation of inability to pay his debts at the time.

■ Petitioner complains that at one point the Referee states that the question is "whether the fact of such insolvency could have been ascertained by a reasonable investigation"; nevertheless, elsewhere the Referee correctly states that the question is: "did the creditor who received the payment have reasonable cause to believe that the debtor was insolvent on November 30, 1963?" For the purpose of this decision we will assume that the Referee had in mind the latter test, which is the correct one.

It is not contended that KGU had actual knowledge of insolvency, and this

Court finds that it had no actual knowledge.

Another erroneous finding of the Referee is to the effect that the evidence showed "that the bankrupt issued a check in July, 1962, to this creditor which was not paid until October of 1962 and issued a second check dated October 31, 1962, payable to the creditor which was not paid in fact until July, 1963." There is no such evidence in the record.

Another complaint of petitioner is to the Referee's finding that "There had been meetings of the bankrupt's creditors and the credit manager of the radio station testified that he did not attend such meetings but made up his mind as to the questionable insolvency of any debtor from his own information." If this means, as it appears to, that the Referee is holding that there had been any meeting or meetings of creditors of the debtor *before* November 30, 1963, then the Referee is obviously mistaken in the light of the evidence, which discloses no such meetings until *after* the payment. Thus, Danford testified:

"Q When did you first become aware of the financial condition of Pope Associates, of the difficulty?

"A You mean when they were really in trouble?

"Q Yes. When did you first become aware of that?

"A Frankly, I don't know. It was a great—it was a long time afterward. I wasn't interested. We got our money, and as far as I know, I didn't know until many months later that they had had a creditors' meeting and I found that out through our collection agency. They told me that they had had a creditors' meeting.

"Q Do you know when that creditors' [meeting] was?

"A No, I don't." (Tr. 30).

Thus there is no evidence of any creditors' meetings, known or unknown to KGU, before November 30, 1963.

After a number of findings of fact, including the erroneous ones referred to in this decision, the Referee further held

that wholly aside from those findings which he felt were sufficient to put the creditor on notice, there was the fact that the account had been assigned for collection on November 26 to a collection agency, and that "With all the facilities which the collection agency has for ascertaining the collectibility of accounts, it is inconceivable that it did not know of the insolvency of this debtor when the assignment was made and when it made this demand for payment and when it promptly sued and effected collection." This, of course, is pure conjecture with no evidence to support it.

The referee then imputes this conjectural "knowledge" on the part of the collecting agent to KGU itself. Assuming that imputing actual knowledge of an agent to its principal is legally sound in this connection, the Referee was not justified in making an arbitrary assumption that a collection agency, merely because presumably it has credit facilities (an assumption specifically denied by Mr. Leder as to this particular collection agency), automatically has knowledge of the condition of the debtors from whom it attempts to collect money.

■ The action of the collection agency in making a prompt demand for payment, receiving a "negative" response, and then promptly filing suit, does not establish any probable cause to believe that the debtor was insolvent. A collection agency is in business to make money on the commissions it can earn on collections made by it. The prospect of a substantial commission on a large debt is fully sufficient to account for its prompt action in suing to collect when the debtor does not immediately pay in full or make arrangements to do so satisfactory to such collection agency. In this case the failure to receive a "satisfactory" answer to, or the receiving of a "negative" result from, a telephonic demand for payment is certainly not evidence per se of insolvency, nor is it sufficient of itself to establish reasonable cause to believe that the debtor is insolvent, on the part of a collection agency

not shown to have had any previous contact or experience with this debtor.

Now, is the garnishment of the various organizations owing money to the debtor in itself evidence of reasonable cause on the part of the collector to believe the customer is insolvent? It is standard procedure for any collection agency to garnish all known or suspected customer accounts and banks with which the debtor is known or believed to be dealing.

The other indicia pointed out by the Referee as tending to establish that KGU on November 30, 1963, had reasonable cause to believe the debtor was insolvent, appear to this Court either by themselves or collectively under the circumstances of this case, insufficient to establish such fact by a preponderance of the evidence.

There might be sufficient to prove that KGU had reasonable cause to. *suspect* that the creditor might be insolvent, but this is not sufficient to satisfy the statute. See the landmark case of Grant v. First National Bank (1878) 97 U.S. 80, 24 L.Ed. 971.

The fact that this was only the second agency account of this type that KGU had ever referred to a collection agency, the fact that the debtor had been slow in making payments over a substantial period, the fact that the total amount due on November 30 might have been slightly greater than at any other time from this particular debtor, the fact that the credit manager of KGU knew that the debtor was delinquent to some extent to the Hawaii Newspaper Agency with which the newspaper that owned KGU was affiliated, the fact that Mr. Danford, credit manager of KGU had had a number of telephone calls and conversations with Pope regarding the arrearages, again are neither of themselves, nor together with other facts, sufficient in this Court's opinion, to prove reasonable cause to believe that the debtor was insolvent. This is especially true in the light of the uncontradicted testimony both of Danford of KGU, and Pope of the

debtor corporation, that shortly before the accounts were assigned for collection, Pope had assured Danford that there was nothing to worry about, since he had good outstanding accounts, including the Matson account, which was good for $100,000.00 a year. The fact that Pope was having difficulty with his bookkeeping would certainly not prove anything, except, as counsel for the debtor says, sloppy business practices, a fault much too common with small businesses.

Moreover, the Referee's findings to the effect that " * * * the debtor indicated that it was having difficulty in collecting its outstanding accounts receivable;" and that " * * * other companies associated with Hawaii Newspaper Agency were having difficulty in effecting collection of their accounts from this debtor." are not supported by any substantial evidence.

Finally, the fact that the payment was made with a check of a third party three days after suit was filed, again proves nothing. Rather, it seems to this Court the natural thing, since this same third party had been garnished in the collection action and it was to its interest and that of the debtor that the garnishment be lifted, freeing the parties to do business in a normal manner, as well as releasing the bank accounts that had been garnished.

In this connection the only testimony of Danford as to other creditors of the debtor corporation was that he knew the debtor was in arrears as to some money owing to the "Hawaii Newspaper Agency" which was the operating agency for the Advertiser and the Star Bulletin (Tr. 25). This does not prove necessarily that the debtor owed both papers, for he could have owed only one, namely the Advertiser Publishing Company, which owned KGU and was the same party in interest. Nor is the amount of what he owed at that time shown.

At page 34, Mr. Danford testified as follows:

"THE REFEREE: Well, you knew that he was having difficulty in mak-

ing his current obligations when you assigned this account, didn't you?

"A With me? I assumed he must have had some. He couldn't pay us."

 Moreover, there is no evidence to support the Referee's findings that Danford knew or that KGU knew that Pope was having difficulty collecting from his clients. The only testimony along that line is that of Pope who, without imputing knowledge thereof to Danford of KGU, testified as to the custom of Pflueger, one of his larger clients, in sending invoices back to the Mainland, which sometimes caused the debtor herein to have to wait 60 to 90 days for its money.

The order of the Referee is therefore reversed, and judgment will be entered in favor of KGU and against the trustee. However, each party will bear its own costs.